IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MATTHEW E. B.,[1]  )
 )
       Plaintiff, )
 )
vs. ) Case No. 19-cv-119-DGW[2]
 )
COMMISSIONER of SOCIAL )
SECURITY, )
 )
       Defendant. )

## MEMORANDUM and ORDER

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Income Security (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for disability benefits in April 2014, alleging disability as of February 15, 2012. After holding an evidentiary hearing, an ALJ denied the application on December 4, 2017. (Tr. 20-36). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1).

---

[1] In keeping with the court's practice, plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Docs. 9 & 19.

Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred in assessing the reliability of plaintiff's subjective allegations.

2. The RFC assessment was erroneous in that both the mental and physical limitations were not supported by substantial evidence.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

plaintiff unable to perform his former occupation? and (5) Is the plaintiff unable to perform any other work?   20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled.  A negative answer at any step, other than at step three, precludes a finding of disability.  The plaintiff bears the burden of proof at steps one through four.  Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show that there are jobs existing in significant numbers in the national economy which plaintiff can perform. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).  Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).   This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is

taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### **The Decision of the ALJ**

The ALJ followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. He was insured for DIB only through December 31, 2014.

The ALJ found that plaintiff had severe impairments of degenerative disc disease status post compression fractures, obesity, COPD/asthma, hypertension, generalized anxiety disorder, depression, and history of polysubstance abuse.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the light exertional level limited to occasional climbing of ramps, stairs, ladders, ropes, and scaffolding; frequent balancing, stooping, kneeling, crouching, and crawling; and no concentrated exposure to pulmonary irritants. Mental limitations were that he was limited to understanding, remembering, and carrying out instructions for simple tasks on a sustained basis in a work setting that does not require interaction with the general public, and is able to respond appropriately to simple changes in routine work settings.

Plaintiff had no past relevant work. Based on the testimony of a vocational expert, the ALJ concluded that plaintiff was not disabled because he was able to do jobs that exist in significant numbers in the national economy.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to plaintiff's arguments.

1. **Agency Forms**

Plaintiff was born in 1987 and was 30 years old on the date of the ALJ's decision. (Tr. 304). He worked as a "helper" for a subcontractor from August through November 2010. (Tr. 308).

In a Function Report submitted in June 2014, plaintiff said he could not work because a "failed tendon" in his left ankle disrupted monthly and the muscle attached to his left ribcage detached whenever he lifted objects. Also, his "mental diagnosis" made him "prone to violent outbursts." (Tr. 315). In November 2015, he reported that he had problems with major depression, schizophrenia, and bipolar disorder. He had back problems and a broken wrist that had healed wrong. He had numbness and tingling in both legs and his hands were going numb. (Tr. 369). He said that he had resumed counseling for his mental conditions in 2015 and was going biweekly. (Tr. 370).

Plaintiff submitted a "Recent Medical Treatment" form in March 2016, identifying treatment from Dr. Linda Hungerford. He said that Dr. Hungerford prescribed mirtazapine (Remeron) for depression and insomnia, and venlafaxine (Effexor) for memory loss. (Tr. 393-395).

2. **Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing in July 2017. The ALJ asked counsel if he knew of any outstanding evidence. He said no, except that plaintiff had an upcoming appointment with Dr. Chen to review an MRI of brain. The ALJ stated that he generally did not "wait for records that haven't been generated yet." (Tr. 130-131).

Plaintiff had two children, ages four and seven. He was about 6' 1" tall and weighed 285 pounds. He tried working in 2014. He was putting together seats for Toyota. He was fired because he did not move fast enough and was not able to follow directions. (Tr. 133-134).

Plaintiff only had his children part of the time. His wife did most of the housework. He did some cooking and grocery shopping. (Tr. 138-139).

Plaintiff testified that he had a car accident in January 2015. Three vertebrae were broken. He had a balloon kyphoplasty procedure in which cement was injected into a lumbar vertebra. His doctor told him that he had damage to the sciatic and other nerves. It was hard for him to do "most anything." He had pain from the middle of the back down and numbness in his legs. He took Neurontin for a while but learned that long term use could cause organ failure, so his primary

care doctor took hm off it. Doctors offered him muscle relaxers, but he did not feel they were appropriate because of the psychotropic drugs that he took. (Tr. 135-136).

Plaintiff said he also had psychological problems. He had been diagnosed with "major depressive bipolar." He could not stand to be around other people. He could not concentrate, and his memory was "almost completely shot." He took Xanax for a year and a half, and it caused him to black out. At the time of the hearing, he was taking venlafaxine and mirtazapine. Venlafaxine slowed his thoughts down and helped with anxiety and helped him "not hear things so much." (Tr. 137-138). He sometimes heard voices and sometimes music. (Tr. 142).

### 3. Relevant Medical Records

Plaintiff went to the emergency room in May 2012 for depression, anxiety, and suicidal thoughts for the last three months. He was going through a divorce and had limited contact with his children. A mental health counselor met with him and arranged an outpatient appointment for him. He was a "violent offender" against his wife and had been ordered by a court to attend anger management counseling. He had a history of using K2 with the last use about a month earlier. The diagnoses were suicidal ideation, depression, and substance abuse. (Tr. 455-461).

Plaintiff received primary health care from PA Fritcher at Fairfield Community Health Center. He was seen in May 2012 for depression and anxiety and was prescribed Wellbutrin. (Tr. 637). He missed his follow-up appointment

but was seen in July.    Wellbutrin made him irritable.    He was scheduled to see Dr. Hungerford in a week.    PA Fritcher started him on Lamictal.    (Tr. 636).

Plaintiff saw Dr. Hungerford, a psychiatrist, seven times between September 2012 and March 2014.  (Tr. 435-448).  At the first visit, he requested Xanax. The doctor instructed him to stop previous antidepressants and to stay clean and sober.  She prescribed Xanax.  He returned in about two weeks, requesting an early refill of Xanax because he was going out of town to see a friend with whom he wanted to "move forward in a relationship."  He had lost weight but did not know how other than he was being more active.  He had stopped smoking marihuana. The diagnosis was major depressive disorder, recurrent.   The doctor also suspected bipolar II because of rapid change in mood, travelling, and purchase of an airline ticket before monitoring the refill of his medication.   In March 2013, his mood was improving, and he was working things out with his wife, "especially since [patient] is beneficiary to land that has recently been found to contain oil."   His appearance was disheveled, but his affect was appropriate, and mood was normal. He had no delusions or hallucinations.     He reported that he had been served with divorce papers in June 2013.   In August 2013 he was obsessing about getting full custody of his children and said his Xanax was kept in a safe and he did not know the combination.   His mood was anxious.   In September 2013 he said he was in charge of his grandfather's $175,000 estate.    Xanax was renewed.

Plaintiff went to the emergency room because he was out of Xanax on March 12, 2014.   He had missed four doses.   The nurse called the pharmacy and learned

that Dr. Hungerford had discontinued the prescription because she thought plaintiff was selling it. He was prescribed seven days' worth of Xanax. (Tr. 524-527).

Plaintiff saw Dr. Hungerford on March 20, 2014. Dr. Hungerford told him she had stopped his prescription because she heard second-hand that someone with his name was selling Xanax. She offered to withdraw him with Lorazepam on a weekly schedule, but he was not interested, and he was not interested in finding other medications that could help his mood. Plaintiff said he had done "everything I was supposed to do" regarding still getting Xanax. The doctor wrote, "This can be discredited by reviewing his attendance record with counselor and this provider." On exam, his affect was appropriate, and mood was irritable. Memory was intact. Judgment was impaired. Dr. Hungerford refused to prescribe Xanax, and he left the office without scheduling another appointment. (Tr. 447-448).

Plaintiff fractured his left ring finger in April 2014 while doing metal scrapping and his finger was crushed by some machinery. (Tr. 539).

Plaintiff was in a one-car accident in January 2015. He was ejected from the vehicle and had a blow to the head with loss of consciousness. At the emergency room, he was diagnosed with mild wedge compression fractures of T-10, 11, and 12, and right transverse process fractures at L-3 and L-4. CT scans of the head and cervical spine were negative. He was given twenty Percocet tablets and told to follow-up with his doctor. (Tr. 583-588).

He saw PA Fritcher in February 2015. He complained of bleeding from his

scrotum. He had no complaints of back pain. He appeared unkempt but was cooperative. He was prescribed inhalers for wheezing. He was said to be married and living with his spouse, son, daughter, and grandfather. (Tr. 630-631).

A lumbar MRI done in March 2015 showed multilevel disc bulges, abutment of the L-4 nerve root, abutment or mild compression of the right L-5 nerve root, and severe compression of the left L-5 nerve root. (Tr. 558-559). PA Fritcher referred him to orthopedic surgery for back pain. (Tr. 629).

In July 2015, Fred Klug, Ph.D., performed a consultative psychological exam. Plaintiff said he could not work because he had bipolar disorder and major depression. He was not taking any psychotropic medications. Dr. Klug concluded that plaintiff's attention span was adequate, and concentration was good. Reasoning, abstract thinking, and judgment were poor. Hallucinations were not evident. (Tr. 671-675).

Plaintiff began seeing a pain management specialist, Dr. Bhaskara, in July 2015. He told the doctor that a Dr. Froley told him he was not a surgical candidate. He also said that, about seven years ago, a 700-pound machine fell on his right lower back, causing "nerve damage." He complained of chronic low back pain with tingling and numbness in the feet. The doctor diagnosed lumbar degenerative disc disease with sciatica, excessive BMI, deconditioning, lumbosacral spondylosis, and nonhealed fracture of T-12. (Tr. 719-722). He performed a

kyphoplasty at T-12. [4] Dr. Bhaskara noted that his psychiatric problems contraindicated long term use of habit-forming pain medications. (Tr. 688-689).

On Dr. Bhaskara's referral, plaintiff had physical therapy in August and September 2015. (Tr. 741-745, 750, 777). He again went to physical therapy in January 2016, but did not return after the initial evaluation because, according to his wife, he was unable to move for three days after the evaluation. (Tr. 782).

Dr. Raymond Leung performed a consultative physical exam in September 2015. Plaintiff was not taking any pain medications and did not use a cane. He weighed 269 pounds. His lungs were clear to auscultation with no rales, rhonchi, or wheezes. His gait was slow with a mild limp. He was able to tandem walk and squat one-half of the way down. He could not heel walk, toe walk, or hop. Straight leg raising bilaterally was to forty degrees. He had no muscle atrophy or spasm. Sensation was within normal limits. Lumbar range of motion was limited in that forward flexion was 60 out of 90 degrees and both left and right lateral bending were 20 out of 25 degrees. (Tr. 734-740).

On a referral from PA Fritcher, Dr. James Harms saw plaintiff for a second opinion regarding his back in June 2016. Plaintiff was taking Norvasc (blood pressure medication), Symbicort (asthma medication), Remeron (antidepressant), and Effexor (antidepressant). Plaintiff gave a history of a car accident and said he

---

[4] "Kyphoplasty is a minimally invasive procedure that is performed to restore height in a damaged vertebra and stabilize the bone." The procedure involves "creating space within the vertebra and injecting a specially formulated cement into the bone through a balloon-like device." https://spine.memorialhermann.org/kyphoplasty/, visited on September 4, 2019.

had a head injury and was unconscious or at least confused. On exam, tapping on his back caused discomfort. He could forward bend to get his fingers to his knees. Backward bending was moderately limited. There was cogwheel-like giving way of the extensor hallucis longus.[5] Appreciation of light touch was decreased in dermatomes L-3 through S-1. Straight leg raising at about 80 degrees gave some backache or tightness. He walked on his own but did not look "perfectly comfortable." Dr. Harms reviewed a lumbar MRI from March 2016. He said there was not any pressure on the nerves, the discs "look great," and there was "not a lot of arthritis." Dr. Harms concluded that plaintiff "has a problem with more sensitive nerves than average. It may be that his head injury is responsible for this. There are lots of other causes." He concluded that there were no procedures that were likely to help and recommended "nerve medication" and an exercise program. (Tr. 770-771).

4. **Medical Opinions**

In July 2015, acting as a state agency consultant, Howard Tin, Psy.D., assessed plaintiff's mental RFC based on a review of the file contents. He used electronic versions of the agency forms that are commonly used for this purpose, the Psychiatric Review Technique Form and the Mental RFC Assessment Form. (Tr. 164-165, 172-174). On the PRT Form, he indicated that plaintiff had

---

[5] "The extensor hallucis longus muscle extends the foot's big toe. Also, the muscle assists in dorsiflexing, which involves moving the foot so that the toes are closer to the shins. In addition, the muscle helps with the foot's inversion, the action that causes the foot to tilt onto its outer edge." https://www.healthline.com/human-body-maps/extensor-hallucis-longus-muscle#1, visited on September 5, 2019.

moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the Mental RFC form, he answered "yes" to the question "Does the individual have sustained concentration and persistence limitations?" Under that section of the form, he rated plaintiff as "moderately limited" in ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, and in ability to work in coordination with or in proximity to others without being distracted by them. Dr. Tin also answered "yes" to the question "Does the individual have social interaction limitations?" He rated plaintiff as "moderately limited" in ability to interact appropriately with the general public.

In the sections for "narrative discussion" under each of the above areas, Dr. Tin wrote "See below." This apparently refers to the last area of the form, entitled "MRFC-Additional Explanation." Here, Dr. Tin wrote, in part, "Claimant has difficulty carrying out detailed instructions and maintaining attention and concentration for extended periods of time, however the person is capable of performing simple tasks."

## Analysis

Plaintiff argues first that the ALJ erred in determining the reliability of his subjective allegations.

SSR 16-3p, effective March 28, 2016, superseded SSR 96-7p on evaluating the claimant's statements about his symptoms. SSR 16-3p does not change the prior standard; rather, it emphasizes that:

> In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person. Rather, our adjudicators will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities. . . .

SSR 16-3p, 2016 WL 1119029, at *10.

As did SSR 96-7p, the new SSR requires the ALJ to consider the entire record, and to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 16-3p, at *7.

The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). That is what the ALJ did here.

The ALJ discounted plaintiff's allegations because they were "not entirely consistent with the medical evidence and other evidence in the record." (Tr. 27, 34). However, the ALJ misconstrued or ignored pertinent medical evidence in drawing that conclusion.

The ALJ found it significant that plaintiff "did not have much treatment for

his mental impairments." In reviewing the mental health treatment, he noted that plaintiff attended counseling and saw Dr. Hungerford between 2012 and 2014. He noted that plaintiff was not taking any medications for his mental impairments at the time of Dr. Klug's exam in July 2015. And, he concluded that plaintiff's anxiety was not so serious as to prevent him from travelling long distances based on plaintiff's statement to Dr. Hungerford about going out of town. All of these observations are problematic.

The ALJ downplayed the severity of plaintiff's mental impairments based on an incomplete view of his treatment. Although the records are not in the transcript, plaintiff's "Recent Medical Treatment" form, submitted in March 2016, said he was being treated by Dr. Hungerford and that Dr. Hungerford prescribed mirtazapine (Remeron) for depression and insomnia, and venlafaxine (Effexor) for memory loss. (Tr. 393-395). This information is confirmed by Dr. Harms' notes from June 2016 indicating that plaintiff was taking Remeron and Effexor. (Tr. 770-771).

The conclusion that plaintiff had not had much mental health treatment was not supported by the record. Plaintiff notified the agency months before the hearing that he was again seeing Dr. Hungerford. Failing to obtain those records was arguably a breach of the ALJ's independent duty to develop the record fully and fairly. 20 C.F.R. § 404.1512(b). "Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits [internal citation omitted]." *Sims*

*v. Apfel*, 120 S. Ct. 2080, 2085 (2000).  Beyond that, it was clearly not the case that plaintiff took no psychotropic medication after July 2015.  The ALJ had before him Dr. Harms' notes indicating he was taking two antidepressants in June 2016.

The ALJ's interpretation of the significance of plaintiff's request for an early refill of Xanax because he was going out of town completely ignores Dr. Hungerford's interpretation.  The ALJ concluded that plaintiff's anxiety was not so bad because he was "able to travel long distances."  (Tr. 31).  In contrast, Dr. Hungerford diagnosed major depressive disorder, recurrent, and suspected bipolar II because of rapid change in mood, travelling, and purchase of an airline ticket before monitoring the refill of his medication.  (Tr. 437).

The ALJ also misconstrued the medical evidence regarding plaintiff's back pain.  He relied on physical therapy records from 2016 to conclude that plaintiff's "back pain had sufficiently resolved" such that he was able to do chin-ups, push-ups, crunches, and sit-ups, and that his radicular symptoms had decreased.  (Tr. 29).  The problem here is that those 2016 records concerned another patient, not plaintiff.  Those records were removed by the Appeals Council for that reason.  See, Tr. 772, 778, 779.  There is no evidence to support the conclusion that plaintiff was able to do push-ups, etc., in 2016.

For the above reasons, the ALJ's assessment of plaintiff's RFC was also unsupported by substantial evidence.  In addition, the ALJ failed to account for plaintiff's moderate limitation in maintaining concentration, persistence, or pace.

The ALJ's RFC assessment and the hypothetical question posed to the VE must both incorporate all of the limitations that are supported by the record. *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). This is a well-established rule. See, *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) (collecting cases). If the ALJ finds that a plaintiff has a moderate limitation in maintaining concentration, persistence or pace, that limitation must be accounted for in the hypothetical question posed to the VE; in most cases, limiting the plaintiff to simple, repetitive tasks or to unskilled work is not sufficient to account for moderate concentration difficulties. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010). Plaintiff made this argument in his brief, citing *Yurt*. Docs. 21, pp. 16-17. Defendant did not respond directly to the point.

Here, the ALJ found that plaintiff had moderate difficulties in maintaining concentration, persistence or pace at step three of the sequential analysis when determining whether plaintiff's mental impairments meet or equal a listed impairment. He noted that, while the step three determination is not a mental RFC assessment, the ultimate RFC assessment "reflects the degree of limitation the undersigned has found in the 'paragraph B' mental functional analysis." (Tr. 26).

The ALJ gave "great weight" to Dr. Tin's opinion.[6] He noted that Dr. Tin has "program knowledge," had reviewed information from multiple sources, and his opinion was consistent with the majority of the mental status examinations. (Tr.

---

[6] The ALJ referred to multiple "state agency psychological examiners," citing Exs. 3A and 4A. There is no second state agency review in the record. In fact, both exhibits contain only Dr. Tin's July 2015 report. See, Tr. 164-167, 169-174, 185-186, 187-189.

33).

The Seventh Circuit has repeatedly held, with exceptions not applicable here, that a limitation to simple, repetitive tasks or unskilled work does not adequately account for a moderate limitation in maintaining concentration, persistence or pace. In *Stewart, supra,* a case decided in 2009, the Court observed, "The Commissioner continues to defend the ALJ's attempt to account for mental impairments by restricting the hypothetical to 'simple' tasks, and we and our sister courts continue to reject the Commissioner's position." *Stewart*, 561 F.3d at 685. The Court has reaffirmed that position several times in recent years. "[O]bserving that a person can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis, including, for example, over the course of a standard eight-hour work shift." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019). See also, *DeCamp v. Berryhill*, 916 F.3d 671 (7th Cir. 2019); *Winsted v. Berryhill*, 915 F.3d 466 (7th Cir. 2019); *Moreno v. Berryhill*, 882 F.3d 722 (7th Cir. 2018), as amended on reh'g (Apr. 13, 2018); *Taylor v. Colvin,* 829 F.3d 799 (7th Cir. 2016); *Varga v. Colvin,* 794 F.3d 809 (7th Cir. 2015).

An ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), internal citations omitted. Here, both the assessment of plaintiff's subjective allegations and the RFC assessment were not supported by substantial evidence. The Court must conclude that the ALJ failed to build the requisite

logical bridge here.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

DATE: September 9, 2019.

**DONALD G. WILKERSON**
**UNITED STATES MAGISTRATE JUDGE**